FILED
COURT OF APPEALS
DIVISION II

2014 FEB 11 AM 8:37

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42659-5-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| DESHAN AKEEM WATSON, | |
| Appellant. | |

BJORGEN, J. — Deshan Akeem Watson appeals the trial court's denial of his motions for post-conviction deoxyribonucleic acid (DNA) testing. He asserts that the trial court erred in denying his motions, because they satisfied the requirements of the post-conviction DNA testing statute, RCW 10.73.170. Because any error in the trial court's consideration of Watson's post-conviction DNA testing motions is harmless, we affirm.

## FACTS

Andrew Blaine lived in a house in Clark County, Washington with his brother, Joshua Blaine, Ann Westelin, and Matthew Halligan. Halligan sold marijuana out of the home. Watson denied knowing Halligan, but admitted that he may have purchased marijuana at his house.

On the morning of February 14, 2003, Andrew[1] and Halligan were at home when Andrew woke up and heard voices outside his closed bedroom door. Andrew opened his door and was "rushed" by a man in a black mask and black clothing. Report of Proceedings (RP) at 149. The man struck Andrew in the face with an object that appeared to be a firearm and pushed him onto the floor. Andrew saw a different man, wearing a black ski mask and with corn rows in his hair, wrestling with Halligan in Halligan's bedroom. When the man who attacked Andrew walked over to Halligan's room, Andrew fled the house. Once outside, Andrew decided to return to the house to help Halligan and found him on his bed with a puncture wound in his chest. Halligan later died at the hospital. Officers found digital scales and sandwich bags containing green vegetable matter in Halligan's bedroom.[2] Officers also found a stocking cap, a neoprene face mask and a handgun magazine in the house. Watson acknowledged that he used to own a cap and face mask like those found in Halligan's house, but stated that he had not seen the items since November 2002. Watson further acknowledged that it was possible that the cap and face mask found by police could be the same ones that he had owned. Neither Andrew, Joshua nor Westelin recognized the mask.

---

[1] We refer to Andrew Blaine and Joshua Blaine by their first names. We intend no disrespect.

[2] They additionally recovered a roll of duct tape. Fingerprints on the duct tape were traced to Tricia Jolene Stuckey, who did not testify. Based on stipulated facts presented to the jury, Stuckey was a clerk at a local 24-hour food market and regularly smoked marijuana. She did not recall selling the roll of duct tape and she did not recognize Halligan's name, although she "may have purchased marijuana from [him] without knowing who he was." Report of Proceedings at 451.

Washington State Patrol forensic scientist Will Dean tested the neoprene mask and wool cap using short tandem repeat (STR) testing. Dean found more than one person's DNA on each tested object, called a "mixed sample." RP at 471-72. With respect to the mask, Dean concluded that Watson's DNA profile was a possible contributor to the mixed DNA sample. Dean set the statistical comparison at 1 in 20 million, meaning approximately 14 people in the United States would share that DNA profile. Dean classified Watson's DNA profile as one of two "major contributors" of DNA evidence on the mask. RP at 471-72, 525. Vanora Kean, a defense DNA expert, acknowledged that Watson's DNA profile was a contributor to the mixed DNA sample found on the mask, but set a statistical comparison of 1 in 2 million.

Brandon Lockwood testified that a few days before February 14, he, Watson, and Ray Suggs boarded a bus together and that, while riding the bus, Suggs told Watson that he had purchased marijuana from Halligan and knew where Halligan stored his marijuana. Lockwood also stated that Watson and Suggs discussed how they "could go into [Halligan's] house and . . . hold him at gunpoint and scare him and just take his weed." RP at 320. Lockwood testified that Watson told Suggs that he could obtain a revolver and ski masks. Lockwood further testified that both Suggs and Watson had corn row style hair at the time he rode the bus with them. A day or two later, Lockwood learned of Halligan's murder and spoke to the police.[3]

On February 3, 2005, the State charged Watson by amended information with first degree murder and second degree assault. The State also alleged that Watson was armed with a firearm

---

[3] Lockwood initially testified that he recalled officers "coming and talking to" him about the bus ride. RP at 326, 412. On cross-examination, he testified that he initiated a call to the police after speaking with his mother and sister.

during the commission of both offenses. A jury returned verdicts finding Watson guilty of first degree murder and second degree assault and returned special verdicts finding that he was armed with a firearm during the commission of both offenses.

On May 12, 2011, Watson filed a motion pursuant to RCW 10.73.170 for post-conviction DNA testing of the face mask found at the crime scene. Watson argued that a more accurate form of DNA testing was available and that retesting the mixed DNA sample from the mask could eliminate him as a potential match. The trial court denied Watson's motion in a letter ruling on May 18, 2011, on the ground that "DNA testing was completed, and the defense had their own DNA expert at trial." Supp. CP at 39. After Watson filed an appeal, we advised him that the trial court's letter denying his request for post-conviction DNA testing "[was] not a decision of the trial court appealable as a matter of right" and that he needed a final order from the trial court denying his motion in order to proceed with his appeal. Supp. CP at 41.

On July 5, 2011, the trial court denied Watson's request to enter a final order, and we subsequently dismissed his appeal. On September 12, 2011, Watson filed a second request for post-conviction DNA testing with the trial court for the same reasons set out in his original motion. The trial court responded that "[n]o action" would be taken on the motion. Supp. CP at 50. On October 6, 2011, Watson again appealed the trial court's response to his motion, and we accepted his appeal. Watson timely appeals the trial court's denial of his motion for post-conviction DNA testing.

ANALYSIS

Watson contends that the trial court abused its discretion by denying his motions for post-conviction DNA testing. Because Watson's motions failed to satisfy the substantive

requirements of the post-conviction DNA statute, RCW 10.73.170, any error in the trial court's consideration of his motions was harmless and, thus, we affirm the trial court's ruling.

We review a trial court's ruling on a motion for post-conviction DNA testing for an abuse of discretion. *State v. Thompson*, 173 Wn.2d 865, 870, 271 P.3d 204 (2012). A trial court abuses its discretion when it bases its decision on untenable or unreasonable grounds. *State v. Magers*, 164 Wn.2d 174, 181, 189 P.3d 126 (2008).

RCW 10.73.170 allows a convicted person serving a prison sentence to request post-conviction DNA testing, stating in relevant part:

> (1) A person convicted of a felony in a Washington state court who currently is serving a term of imprisonment may submit to the court that entered the judgment of conviction a verified written motion requesting DNA testing, with a copy of the motion provided to the state office of public defense.
> (2) The motion shall:
> (a) State that:
> (i) The court ruled that DNA testing did not meet acceptable scientific standards; or
> (ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or
> (iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;
> (b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement; and
> (c) Comply with all other procedural requirements established by court rule.
> (3) The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.

To be entitled to post-conviction DNA testing under RCW 10.73.170, the "person requesting testing must satisfy both procedural and substantive requirements." *State v. Riofta*, 166 Wn.2d 358, 364, 209 P.3d 467 (2009). Specifically,

The motion must state the basis for the request, explain the relevance of the DNA evidence sought, and comply with applicable court rules. RCW 10.73.170(2)(a)-(c). If the petitioner satisfies these procedural requirements, the court must grant the motion if it concludes the petitioner has shown the "likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3).

*Riofta*, 166 Wn.2d at 364.

Because it is determinative of the issues before us, we address only the substantive requirement of RCW 10.73.170. In contrast with the "lenient" procedural requirements of RCW 10.73.170(2), the substantive requirement of RCW 10.73.170(3) is "onerous." *Riofta*, 166 Wn.2d at 367.

In determining whether a convicted person "has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis," a court must look to whether, viewed in light of all of the evidence presented at trial or newly discovered, favorable DNA test results would raise the likelihood that the person is innocent on a more probable than not basis. The statute requires a trial court to grant a motion for postconviction testing when exculpatory results would, *in combination with the other evidence*, raise a reasonable probability the petitioner was not the perpetrator.

*Riofta*, 166 Wn.2d at 367-68.

Here, the trial court denied Watson's first motion for post-conviction DNA testing in a letter ruling that stated, "DNA testing was completed, and the defense had their own DNA expert at trial." Supp. CP at 39. In response to Watson's second motion, the trial court merely responded that "[n]o action" would be taken. Supp. CP at 50. The trial court's letter ruling and its response to Watson's second motion are unclear as to whether it had properly evaluated the likelihood that a favorable DNA test would demonstrate Watson's innocence by a preponderance of the evidence. However, even assuming without deciding that the trial court's stated reasons for denying Watson's motion were inadequate under the statute, we hold that any error would be

harmless. Nonconstitutional error requires reversal only if, "within reasonable probabilities," the outcome of the proceeding "would have been materially affected had the error not occurred." *State v. Crenshaw*, 98 Wn.2d 789, 800, 659 P.2d 488 (1983) (citing *State v. Tharp*, 96 Wn.2d 591, 637 P.2d 961 (1981)). Here, Watson cannot demonstrate that the outcome of his proceeding would have differed had the trial court made a proper inquiry because, even if a new Y-STR[4] test eliminated Watson as a possible contributor to the DNA sample taken from the mask, it would not demonstrate his innocence on a more probable than not basis.

At trial, the State presented Lockwood's testimony that he had heard Suggs and Watson plan to steal marijuana from Halligan using a revolver and face masks. Lockwood's description of Suggs's and Watson's hair matched Andrew's description of one of the men who had attacked him and Halligan. Additionally, Watson admitted that he may have purchased marijuana at Halligan's house in the past. Watson also admitted that he had owned a mask and cap that resembled those found by the police at Halligan's home and that the mask and cap found by police could have been the same cap and mask that he owned. This all constitutes evidence of Watson's guilt that would not be undermined by a new DNA test eliminating him as a contributor to the DNA found on the mask.

In his brief on appeal, Watson concedes that even if his "DNA was eliminated from the mask, it would not preclude him being the second person in the house." Br. of Appellant at 16. He nonetheless argues that he meets the substantive requirement of RCW 10.73.170(3) because a

---

[4] In October 2009, the Washington State Patrol added Y-STR analysis technology to its DNA testing technology. *See* http://www.wsp.wa.gov.forensics/docs.crimelab_news_0610.pdf.

No. 42659-5-II

favorable DNA test would "eliminate [him] as a donor in the mind of the jurors." Br. of Appellant at 16. RCW 10.73.170(3), however, requires more than a showing that a DNA test may result in evidence favorable to the petitioner; to receive a new DNA test, the petitioner must show that the "DNA evidence would demonstrate *innocence* on a more probable than not basis." RCW 10.73.170(3) (emphasis added). As our Supreme Court has noted, "The legislature's use of the word 'innocence' indicates legislative intent to restrict the availability of postconviction DNA testing to a limited class of extraordinary cases where the results could exonerate a person who was wrongfully convicted of a crime." *Riofta*, 166 Wn.2d at 369 n.4. In light of all the evidence presented at trial, and by Watson's own concession on appeal, a favorable DNA test would not exonerate him of his convictions. Accordingly, we hold that any error in the trial court's consideration of Watson's motion for post-conviction DNA testing was harmless and we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, J.

We concur:

JOHANSON, A.C.J.

MAXA, J.

8